[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
BACKGROUND
This case comes to this court in the two above mentioned cases. The first case, the FA case (hereinafter called the family case), began as a relief from abuse under §§ 46b-15, and 52-259. Judge Ryan entered an order on August 2, 1993 which granted the relief from abuse and indicated that the order was continued until further order of the court. Although the parties had been both requesting hearings, they were unable to get the case scheduled until the cases were consolidated and sent to this court. Accordingly, when this court started this case the orders from the family relief case were still in effect. This court then heard evidence simultaneously under the relief from abuse statute and the civil case by agreement of the parties.
The other case is the civil case wherein, the plaintiff brought a law suit requesting injunctive relief. An application for temporary injunction and order to show cause dated July 12, CT Page 7433 1993 was set down for a hearing on August 2, 1993. No hearing took place on that order to show cause and that matter was also referred to this court for full hearing. This court has determined that the burden of proof in both cases is by a fair preponderance of the evidence and held hearings accordingly.
The parties agreed that the civil case injunction would be a permanent injunction. Although the papers cited it as being a temporary injunction, by agreement of the parties, rather than to have a temporary hearing and a final hearing thereafter. The parties stipulated in open court that any orders entering in this case would be permanent and not just temporary. This court then proceeded to hear this case. The civil case is hereinafter called the civil case.
The Ferris — Clark case began on about April 6th and ran for approximately 20 trial days. The court has considered all the evidence in this case including the exhibits and the testimony of all the witnesses in rendering its decision.
FACTS
One witness after another gave us a slice of the lives of these parties and their interaction.
This court will not spend a great deal of time reciting all of the facts, but will focus in on what it considers to be several key witnesses in the case. It is clear to this court after having heard all the witnesses that the permanent injunction in the civil case should be granted and the restraining order in the relief from abuse case should be continued.
This court first notes that it decided Susan Ferris v. WilliamClark on May 20, 1993, and at that time, the court denied the continuation of a restraining order under General Statutes § 46b-15. It is clear that when this court wrote that decision, this court was satisfied that the applicant had not sustained her burden of proof. Several major incidents have taken place since the court decided that case in May of 1993 as will be hereinafter set forth.
Lieutenant James Walters of the Greenwich Police Department testified concerning his discussions with Mr. Clark. Mr. Clark indicated that he thought it was his responsibility to see who Ms. Ferris was dating. He mentioned the fact that he was keeping track of her comings-and-goings to the lieutenant. He had first denied CT Page 7434 having sent the birthday cards, in issue, that the plaintiff would later describe as offensive to her. Mr. Clark later admitted he sent the cards.
Officer Robert Brown of the Greenwich Police Department gave us a description of conduct by Mr. Clark which described him as not being in control of himself on a particular evening when he appeared aggressive, yelling and seemed hostile. The officer even testified that he thought that he might have to consider using his gun based on the conduct of Mr. Clark.
Mr. Braddock of NYNEX, testified to two trapped phone calls from Mr. Clark to Ms. Ferris on January 1, 1994.
Officer Repik of the Greenwich Police Department confirmed that he was involved in the phone call investigation and, although he made application for a warrant, it was denied.
Deputy Chief Peter Robbins of the Greenwich Police Department testified that he believed they had cases where there was probable cause, but that warrants had been refused by the state's attorney's office.
Exhibit DD is the open letter to the members of the First Presbyterian Church. Reverend Richard Stearns, who is quoted in the letter as having told Mr. Clark about certain classic signs of Ms. Ferris, denied under oath that he ever said that. He denied that he had told Mr. Clark to fight back hard or else she would destroy him. He further denied that he in any way encouraged Mr. Clark.
The First Selectman of Greenwich, Mr. Margenot, testified that he was in receipt of a letter on "rottenness" from Mr. Clark when he first came to be selectman.
Attorney Meerbergen, the Greenwich Town Attorney, considered seeking an injunction to keep Mr. Clark out of the library. His feeling was that the problems with Ferris and Clark were police matters and no injunction was brought.
Greenwich Police Chief Moughty has known the defendant Mr. Clark for about two years. His opinion was that warrants that had been sought for Mr. Clark were rejected, not because of lack of probable cause, but rather what he described as "prosecutorial discretion." He disputed Mr. Clark's statement that there had been CT Page 7435 assurances given that he would not be arrested without a warrant. He claims he spoke to Mr. Clark and told him to move ahead with his life, his marriage was over and to stay away from Susan Ferris.
Linda Knopf, an expert in domestic abuse who heads the domestic abuse center at the Greenwich YWCA said that she spoke to Mr. Clark and was of the opinion he was obsessed with Susan Ferris, and was having a hard time letting go. Her opinion was that Susan Ferris was the victim of domestic abuse.
The plaintiff's father, Charles Ferris testified and he indicated that he had an excellent relationship with his daughter and never molested her in any fashion whatsoever and he denied the entire contents of Exhibit DD. He claims he was aggressively assaulted by Mr. Clark at or about the time his daughter and Mr. Clark broke up.
Attorney Martha Deegan testified that she became Susan Ferris' attorney in March 1993, and that it terminated in the summer of 1993. She testified that she observed the plaintiff being bothered by the defendant. He was pacing up and down in front of her office door near the Hurlbutt Gallery. She also claims that she saw him pacing up and down in front of the library while the plaintiff was on the premises. She has seen Mr. Clark pacing outside the door to the corridor of the plaintiff's office many times. She said "he is like a cat looking to pounce on a mouse, the mouse being Susan Ferris."
She testified from her own experience about an incident in the parking lot of an Exxon gas station where she described that Mr. Clark was exhibiting the "rantings of a maniac." She claims that he followed her for two hours prior to that period starting at the clerk's office in the superior court in Stamford. The verbal assault put her in fear. She was gassing up her car up and considered turning the gas hose on him as he approached her. She testified that she believed he was dishonest.
She testified to an incident where Mr. Clark came up behind her daughter age 9 and used the word "whore" to the daughter in December of 1992. On December 22, 1992 she saw him follow her to locations that she went — such as the Wood Den, the paint store, and he followed her on I-95 to Port Chester. She actually saw his face and those events led up to the incident at the Exxon gas pump.
This testimony was particularly compelling to this court and CT Page 7436 persuasive since this person presented to the court a slice of Mr. Clark's life which he has vehemently denied, but fits the pattern of exactly what the plaintiff claims as to the following and the harassing aspects of their meetings.
Steven Weiss, the assistant state's attorney, testified and gave the opinion that Connecticut's stalking law is almost impossible to prove. He is aware of no warrants that have been issued under the Connecticut Stalking Statute. He seems under the opinion that the criminal process cannot solve the problems in this case. He gave Mr. Clark some advice that the marriage was over and to get over it.
There seems to be a substantial dispute between the state's attorney's office, represented by Mr. Weiss, and the Greenwich police department as to what is probable cause. The police who testified indicated that they do not send warrants over unless they believe there is probable cause. Mr. Weiss had indicated that on several occasions he refused to sign warrants because he felt there was no probable cause.
It appears to this court that to some extent the prosecutor's office has looked beyond probable cause and has looked more to guilt beyond a reasonable doubt, contemplating that Mr. Clark would not be coming in and saying "I am guilty", but rather seeking a trial and therefore probable cause was not a high enough standard for the prosecutor's office.
Attorney Brett DeLallo testified concerning an incident where Mr. Clark was apparently being surveiled by the police department. Mr. Clark put him on the stand to establish that he in fact was being the subject of surveillance.
It appears to this court that the Greenwich police department (at least those officers who are involved with the Ferris and Clark situation), have decided that they believe Ms. Ferris and not Mr. Clark and are assisting to make sure that if there are any criminal violations, that appropriate remedies are pursued. It appears that the officers of the department who are involved were looking for a crime committed in their presence rather than "he said/she said" incidents.
Mr. Clark put on a witness, Ms. Devaul, who testified that she had met Susan four or five times and she used the word "hyper or lively" concerning Susan. The defendant used that to show the CT Page 7437 kind of person she was. On the other hand, this court is of the opinion that you take the victims as you find them and if she happens to be hyper, then maybe she's more easily agitated than others. Which may be all the more reason not to do anything to someone like that who may become more upset.
Mr. Clark, on the stand, seemed to indicate that everyone was lying except him. He indicated that the Reverend Stearns was a little bit of a deliberate liar and two-faced. He testified that when the red flag is waved he stands up for his rights. Mr. Clark testified that when he sees police cruisers he beeps to them. Mr. Clark claimed that the deputy chief tooted at him and the deputy chief denied this. In December of 1990, he does admit following the plaintiff on US-1 when he claims she was going to visit Mr. Robinson. He admits making the phone call on the tape as Exhibit DDD-1. The court finds that this was a very inappropriate phone call. Also, the court finds that Exhibit EEE-1 where he talks about a . . . whore house was also an inappropriate phone call.
Mr. Clark claims that the January 1, 1994 trapped phone calls were done without intention. He believes that they were done, if at all, accidently by using his speed dialer.
He offered a simplistic solution to Ms. Ferris' problem by indicating that her problems are related to PMS and the full moon. During the course of his testimony he claimed that in fact, Ms. Ferris was stalking him. He talked in open court about intimate and private details of their relationship in a very open and public fashion. This was very similar to the way he handled the open letter to the parish, Exhibit DD. He claims he never called Ms. Ferris a whore to her face. He says that Ms. Psaki, Mr. Ferris and attorney Deegan are all attempting to set a significant pattern and all are lying. He claims that his log shows attempts by Susan Ferris to create contact. He showed "WW "as the plaintiff and he describes that as Whosey Whatsis (phonetic). There was evidence, however, that "WW" stood for Wesley's Whore. The Log indicated over 130 contacts between the parties post May 20, 1993. When discussing a typical day he talked about 2 hours per day in the library, two hours of reading and then meeting with clients for fund raising and eight hours of sleep.
Mr. Clark indicated that officer Brown lied on the stand.
Ms. Ferris testified that he had called her Wesley's whore on Thanksgiving Day of 1991. Ms. Ferris testified that Exhibit 61 in CT Page 7438 her opinion was vile and obsessed. It scared her. There were contacts in there that she said she didn't even know took place. Ms. Ferris sought help from the First Selectman and had not been able to obtain any. She had hoped that the town attorney would do something, but he did nothing. The police have been unable to work with the state's attorney's office to solve their mutual problems and as a result she feels she is not being protected by the police department or the state's attorney's office.
Two key witnesses stick out to this court in this case. One is Richard Ford, III, and the other is Carolyn Baker. Mr. Ford was an eyewitness to part of the incident that took place on July 2, at McDonald's Restaurant in Greenwich on West Putnam Avenue. The first key part of his testimony was that he testified both on the stand and in his statement that Mr. Clark's vehicle was parked perpendicularly to the corner of the building and directly across the traffic lane making it impossible for cars to drive either in front or in back of the vehicle. Mr. Clark has vehemently denied that he blocked Ms. Ferris' car which was the car directly behind Mr. Clark's car. He also indicated that Clark was agitated and excited. He also saw Mr. Clark waiving papers.
The most compelling testimony came from Carolyn Baker. Ms. Baker was called to the stand by Mr. Gazin. She testified that she is 45 years old and has lived in Cambridge Massachusetts since 1960. She is divorced since 1980. She first met Mr. Clark in the spring, perhaps March of 1993 and it was through mutual friends that they met. They became friendly after that and saw each other in Cambridge and in Greenwich at each others respective apartments.
She testified that she was down visiting Mr. Clark while he was going to court on what she described as the "stalking matter" with Ms. Ferris. She heard Mr. Clark testify that Susan Ferris was stalking him. She testified that she thought it was unusual that he would say that because she had seen him stalking or following Ms. Ferris. She described an incident where Mr. Clark and she were both together at the video checkout in the library and all of sudden he was gone. She followed him and he walked right up toward Susan Ferris and Susan Ferris walked away. She also testified to an incident where he was in the parking lot across from Susan Ferris' house and he ducked under the dashboard when a police car came. Then Susan Ferris' car came out of the driveway and he said "ah, that . . . head" and he took off after her. He drove after her and honked his horn after a couple of blocks. He at one point told her that . . . head was his ex-wife. CT Page 7439
She further testified to a time when they were going to the courthouse in Stamford and he spotted the plaintiff and her father and he speeded up, tailgated them and honked his horn. She described the look on his face when he was doing this as determined and aggressive. She testified that Mr. Clark said Ms. Ferris was insane. That Susan Ferris was in cahoots with the Greenwich police department to punish him. He told her he was going to do everything he could to ruin her. He said he was going to kill her and if he could, he would run her down in his car if given the opportunity. He said he was doing this because Susan Ferris was ruining his life. He told the witness that based on her relationship with someone else, certain people would not touch Susan again. She claimed he said he was bringing the lawsuits against Susan since he knew it was costing her a lot of money and her family a lot of money. In essence it was to run them broke. He told her that he was hoping that the civil cases would reach a point that she would get so distraught and so hysterical that she would do anything to get out of these matters. She would give him money and the like.
She testified she observed Mr. Clark drive while under the influence of alcohol. She remembers driving from New York City to Greenwich at nighttime with him driving. She said something that apparently threatened him because he started speeding up the car recklessly to the point that it scared her and she knew that she had better keep her mouth shut. She said it was scary. She also indicated that dangerous and threatening behavior was exhibited towards her. He apparently discussed with her Exhibit DD. He was reading the letter in what she described as a very impressed tone and she was not impressed. She was horrified. She was embarrassed and her reaction was one of disgust. They got into an argument and he grabbed her arm and got very irate and she was frightened by him.
Based on the foregoing facts, the court finds Susan Ferris has proven her cases by a fair preponderance of the evidence.
LAW
In general for a plaintiff to prevail in an injunction action the plaintiff must show (1) that there is no adequate remedy at law and (2) the plaintiff would be subject to imminent and irreparable damage. See Pet v. Department of Health Services, 207 Conn. 346,370 (1988). An injunction lies within the sound discretion of the CT Page 7440 court. In exercising this discretion the trial court must balance the competing interests of the parties. Further, the relief granted must be compatible with the equities of the case so as not to be greatly disproportionate to the injuries sustained by the complaining party. Dukes v. Durante, 192 Conn. 207, 225 (1984).
For a legal remedy to be adequate, it must be specific and adapted to securing the relief sought by an individual "conveniently, effectively and completely." Burchett v. Roncari,181 Conn. 125, 129 (1980). The court finds in this case, that there is no adequate remedy under the Burchett test.
Irreparable connotes the inability to make good or to restore.Murray v. Egan, 28 Conn. Sup. 204, 208 (1969). Thus, irreparable harm arises when there exists no legal remedy furnishing full compensation or adequate redress for a wrong done to or sustained by an individual. The injury or wrong complained of must be serious or material and not adequately reparable by damages at law in that, such damages will not restore the complaining party to the position in which the party formerly stood. See City of New Londonv. Perkins, 87 Conn. 229, 234 (1913); Gorham v. The City of NewHaven, 82 Conn. 153, 157 (1909); Murray v. Egan, 28 Conn. Sup. 204,208.
Whether such harm exists depends primarily on the nature of the right which is injuriously affected rather than on the pecuniary measure of the loss sustained. Patry v. Board ofTrustees, 190 Conn. 460, 472 (1983).
There must also exist a real or immediate threat that the plaintiff will be wronged, that is, a substantial likelihood of immediate irreparable injury. Silitschanu v. Groesbeck, 12 Conn. App. 57,64-5 (1987). It is also clear that past conduct may be considered in determining at the time of trial the probability of future conduct warranting injunctive relief. Labbadia v. Bailey,152 Conn. 187, 192 (1964).
In the case of Mafera v. Polek, 15 Conn. Sup. 132 (1947), judge Fitzgerald issued a restraining order concerning the disturbing of the tranquility of the plaintiff's home life. The plaintiffs were husband and wife and with their two very small children occupied as tenants the second floor of a house at 80 Hallex Street, New Haven. The defendants were also husband and wife and occupied as tenants the first floor of the same house. Experience has shown in that case that in and out of the court, ill CT Page 7441 feelings between relatives of the blood or by marriage transcend those between non-relatives.
The court found that the defendant husband came within the classification as what is known as a weekend drunkard. He was offensive in speech and action to the point of depravity and his conduct was directed against the plaintiffs causing them great discomforture of mind which has had a physical toll upon the plaintiff wife. The court addresses the issue of the public peace being vital to society generally, and goes on to state on page 133, "but the mere fact that an act was a crime, has not ordinarily, apart from statute prevented equity from giving an injunction if there are other well-recognized grounds for exercising jurisdiction." The court found sufficient grounds to grant the temporary injunction. The court said; "the defendants and particularly the defendant husband, is found to have committed a series of breaches of the peace directed against the plaintiffs. To date, one or more conferences have been held in the city attorney's office between the parties and a representative of that office for the purpose of bringing to an end the existing situation. The result was negative. It was considered that to wait such time as the city attorney's office may see fit to inaugurate a criminal prosecution against the defendants would only afford the defendants more opportunity to make themselves obnoxious to the plaintiffs. Hence, any remedy at law, civil or criminal, available to the plaintiffs could well prove to be without efficacy." In that case, the court granted a temporary injunction despite the probability of criminal prosecution. This court notes in passing, that a bond was required to be posted by the defendants to insure their performance.
This court is satisfied that based on the facts that have been found to be proven by the plaintiff, that injunctive relief should issue in this case.
The court has also read the case of Dickson v. Dickson,12 Wash. App. 183, 529 P.2d 476 (1974). The court found that an injunction in the circumstances of that case did not deny the individual's first amendment rights. In that case, the court looked at the individual's exercise of free speech and found that it infringed upon another's interest in privacy, and in that circumstance the value of speech right must be balanced against the intrusion it makes on the others interest. Such speech may be enjoined when it is not deemed paramount and no other adequate remedy at law exists. CT Page 7442
In that case, the parties divorced in January of 1970 and had been married, for approximately 20 years. From the time of the divorce Mr. Dixon was protesting the granting of the decree and campaigning for a statutory prohibition of divorce. He was writing public officials and organizations across the country. He made derogatory statements about his ex-wife's mental health; asserted that she is still his wife and interfered with her privacy in other ways. The court was faced by Mr. Dixon's primary contention that the injunction sought would prohibit him from his right to free exercise of religion and right to free speech. The court held that first amendment rights are not absolute. The court applied a balancing test weighing the value of the first amendment right against the intrusion into the other's privacy. In addition, Mr. Dixon stated that his wife was insane. The court used the balancing test and found that Mrs. Dixon's privacy and well being outweighed Mr. Dixon's absolute exercise of his first amendment rights of free speech. The court went on to say "we conclude there is no adequate remedy at law because of "the recurrent nature of plaintiff's invasions of right; the need for a multiplicity of damage actions to assert defendant's right; the imminent threat of continued emotional and physical trauma; and the difficulty of evaluating the injuries in this case in monetary terms." This court finds the same problem in the instant case.
In addition, the court finds that the requirements of Connecticut General Statutes § 46b-15 have been established. Accordingly, injunctive relief is granted and the temporary restraining order under Connecticut General Statutes § 46b-15. The order in that case only (the temporary restraining order case, FA93 0132664) is granted for 90 days. The relief obtained in CV93 0133021 the permanent injunction case, is granted without limitation as to time.
ORDER
1. The defendant shall not park on Strickland Road within a one-half mile radius of the plaintiff's property at 83B Strickland Road, Cos Cob, Connecticut.
2. The defendant shall' make no contact with the plaintiff. (Hereinafter called the "other person") Contact includes: (a) coming into visual or physical presence of the other person; (b) following the other person; (c) waiting outside the home, property, place of work or school of the other person or a member of that CT Page 7443 person's family or household; (d) sending or making written communications in any form to the other person; (e) speaking with the other person by any means; (f) communicating with the other person through a third person; (g) committing a crime against the other person; (h) communicating with another person who has some relationship to the other person with the intent of affecting the third person's relationship with the other person; (i) communicating with business or government entities with the intent of effecting some right or interest of the other person; (j) damaging the other person's home, property, place of work, school or automobile; (k) delivering directly or through a third person any object to the home, property, place of work or school of the other person.
3. The defendant is barred from the premises known as the Greenwich Public Library located at 101 West Putnam Avenue in Greenwich, Connecticut except as hereinafter provided. He shall be permitted to enter and use the library between the hours of 12:00 p. m. and 2:30 p. m. Monday through Friday as long as he does not make contact with the plaintiff as contact was previously ordered.
4. The defendant, when he is in the library, is prohibited from the area shown on Exhibit AA attached hereto.
5. During the time he is permitted inside the library, he is prohibited from using the elevators and is to use the stairwells to obtain access from one level to the other.
6. He may attend the activities at the Hurlbutt Gallery after 7:00 p. m. as long as plaintiff is not present, but if he sees her when he arrives or if she arrives at any time when he is there, he must exit the premises immediately.
7. He may not sit in his motor vehicle or remain in the library parking lot or any area surrounding the library within 500 feet during the time he is prohibited from the library.
8. He is not to impose any restraint upon the person or the liberty of the plaintiff.
9. He is to refrain from threatening, harassing, assaulting, molesting, sexually assaulting, or attacking the applicant.
10. He is to refrain from entering the dwelling or the premises of the applicant at 83B Strickland Road. CT Page 7444
11. He is not to park his vehicle at any location that would allow him to have an unobstructed view of plaintiff's house.
12. He is not to toot his horn within one-half mile of the home of the plaintiff except in the case of an emergency. If there is such an emergency, he is to immediately, after having had the emergency and tooted the horn, contact the police department as to what caused the emergency and horn tooting. Failure to notify the police department shall be prima facia evidence of the intent to harass.
13. He shall not follow plaintiff by foot or car or in any other vehicle.
14. Following as used in this order means among other things, its standard definition but, being behind her is enough.
15. He is not to drive on Strickland Road other than to go to his club.
16. He is not to drive on Strickland Road to go to and from his club more than two times per day during the week and three times on weekends.
17. In order to insure performance of this order, the defendant is ordered to post a $5,000.00 cash or professional surety bond with the court in order to insure his performance of these orders. The bond is to be in the form attached hereto.
18. This court reserves to its jurisdiction the first alleged contempt, if any. No contempt shall be filed by motion. All contempts are to be filed by appropriate application, citation and order. Each application shall spell out in some detail the alleged violation referring to the section of this order alleged to have been violated and the activity claimed to be the violation.
19. The court orders that the plaintiff post a $500.00 bond. The bond dated June 12, 1993 attached to the original papers is in form satisfactory to the court and it is to be amended to reflect a permanent injunction and signed by the principal and surety as set forth in the July 12, 1993 bond.
20. The defendant shall post a cash or professional surety bond in substantially the following form: CT Page 7445
KARAZIN, J.
Defendant's Bond
Know All Persons by These presents: That, William J. Clark of Greenwich Connecticut as principal and _______________________ _____________ as professional surety, are holden and firmly bound jointly and severally unto Susan L. Ferris of Greenwich, Connecticut in the penal sum of $5,000.00, for which payment well and truly to be made the obligors hereby bind themselves, for their heirs, executors, successors and assigns firmly by these presents.
The condition of this bond is such that, whereas there has been a duly issued order of the Superior Court the Honorable Edward R. Karazin, Jr., a judge of the Superior Court granting certain injunctive relief as set forth in the Memorandum of Decision dated ______________ day of ________________, 1994. That order makes for certain provisions. In the event of the breach of any of those conditions, and in the event the court hearing the matter orders a monetary payment to be made by the defendant, then in the event that payment is not made then the principal and surety shall make the payment. This bond to remain in full force and effect until further order of the court.
Dated at Stamford, Connecticut __________________________
 _________________________________ William J. Clark
 _________________________________ Professional Surety
[EDITORS' NOTE: THE FLOOR PLAN IS ELECTRONICALLY NON-TRANSFERRABLE.]